# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ABAN ABIEL,<br><br>                              Petitioner,<br><br>v.<br><br>R.J. RACKLEY, Warden,<br><br>                              Respondent. | Case No.: 16cv2685-MMA (JMA)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>[Doc. No. 1]<br><br>**AND DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner Aban Abiel ("Petitioner" or "Abiel"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his second degree murder conviction in San Diego Superior case number SCD244879. (Pet. at 1, ECF No. 1 "Pet.")[1] The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments, and all supporting documents submitted by both parties. For the reasons set

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the court's electronic case filing system.

forth below, the Court **DENIES** the Petition for Writ of Habeas Corpus and **DECLINES** to issue a certificate of appealabilty.

**FACTUAL BACKGROUND**

The Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to a statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

Prosecution Evidence

On February 17, 2012, Abiel attended an event at "Club Kabanas" in Clairemont (the club), a location used for parties and gatherings. Also there were Faroog Maluahi, Madol Wiir, Kedid Manon and victim Marko Aluat. All of the men were friends from the Sudanese community. Aluat and Wiir were best friends. At some point, Abiel told Manon and Kuol Monythot, who was acting as a security guard, that Aluat had pushed him. Abiel was visibly upset. Manon told Abiel not to take it seriously; that Aluat was just playing around. After Manon returned to the club, he heard a fight erupt, and when he went outside he saw Abiel and Wiir fighting. Abiel was screaming and angry, exclaiming at one point, "You a bitch homie." [Footnote 2: Manon identified Abiel's voice on a 911 call recorded at 3:34 a.m. on February 18, 2012. In that call, an unidentified man (No. 1) says, "Hey, stop. Aban," and tells everyone to go home. Another unidentified man says, "I'm not the one (unintelligible). He trying to do this because Marko [Aluat] get mad and whatever then he try to come (unintelligible) mother fucker (unintelligible) tonight." The first unidentified man says, "Aban, Aban, Aban, Aban, Aban, Aban, c'mon man (unintelligible) everybody gotta leave, man (unintelligible) just leave." He then urges Abiel to get in the car to leave because he did not want to get arrested.] Police arrived and told everyone to go home.

Manon and Maluahi left the club and drove to Maluahi's apartment. While in the car, Abiel called Maluahi and asked to speak with Manon. Abiel was cussing at Manon and told him, "I'm going to beat you if I get you." Manon asked what he had done; he did not understand why Abiel was acting hostile toward him. When Maluahi and Manon got to Maluahi's

2

house, Abiel was there. As Manon was getting out of the car, Abiel came running up yelling and cussing, and started to attack him. The men argued, shoving each other, with Manon trying to get Abiel off of him. Monythot and Maluahi broke up the fight, and police eventually arrived. A police officer took Manon home. Manon was crying and upset. Abiel, Maluahi, Monythot and Maluahi's girlfriend returned to Maluahi's apartment, where they looked unsuccessfully for Abiel's car keys. Because Abiel had parked on the sidewalk illegally, he decided to sleep in his car so it would not get towed. Maluahi gave Abiel a blanket and returned to his apartment to sleep.

After Manon got home, he called several people, including Aluat and Abiel, to find out why Abiel was acting in such a way. Abiel accused Manon of taking his car keys and hung up. Manon denied taking Abiel's keys, but later realized he in fact had them in his pants pocket. Manon decided to return to Maluahi's house to return a parking ticket and end his association with the men. He planned to walk there, but while he talked to Aluat on the phone, Aluat told him he wanted to go with him. [Footnote 3 omitted.]

At around 4:00 a.m. or 5:00 a.m. on February 18, 2012, Aluat called his girlfriend, Tonisha Alexander, to pick him up from Wiir's house. According to Alexander, Aluat received multiple phone calls from the time he got in her car; his phone was "constantly ringing." Aluat was not angry, upset or drunk. After several hours, Aluat instructed Alexander to drive to Manon's house to pick up Manon, who Alexander noticed was anxious. Aluat then told her to go to Maluahi's house. When they arrived, Manon left the car first and started walking to Maluahi's house. Aluat spoke briefly with Alexander, who drove away when Aluat waved her off.

Before Manon got to Maluahi's door, he heard Aluat and Abiel yelling and rushed back to them. Abiel had a knife and was standing next to Aluat, who was on the ground. Alexander, who had returned to the scene after looking back and seeing Aluat lying in the street, was screaming, "He had a knife, he had a knife." Manon asked Abiel if he wanted to stab him with it. Abiel punched Manon and walked toward Maluahi's apartment. Manon followed and when Abiel got close to Maluahi's door, Abiel yelled for Maluahi to come out and said, "These people, they come to jump me." Manon told Abiel they had not come there to jump him. Abiel called 911 while he walked into the alley and threw the knife into a dumpster, then returned and punched Manon again. Abiel denied to the 911 operator having any weapons, but claimed he had been attacked in his car and that he had hit

Aluat, who went down and needed an ambulance. Police arrived while Abiel was still speaking with the 911 operator. An officer handcuffed Abiel, who had a small abrasion on his thumb and a small cut on the inside of his lip. Abiel complained to the officer that his face hurt, but he declined medical assistance.

Nineke Koopman, who lived in the area, was awoken early in the morning of February 18, 2012, by loud yelling and called police. She saw four to six black individuals, mostly men, yelling back and forth. When police arrived, some of the individuals left and an officer offered one of the men a ride home. Koopman heard yelling again at about 6:45 that morning. She looked out to see the same three or four individuals yelling at each other. One of the men, who she identified at trial as Abiel, advanced and took a swing at the other, who had been backing away. The man who was trying to get away fell to the ground and never got up. A third man was watching the fight and another was off to the side on his phone. The woman did not see the falling man hit kick or shove Abiel, or physically attack him. Koopman saw Alexander drive up and jump out of her vehicle while Abiel walked back toward the apartment complex.

Aluat suffered a stab wound to his chest, and was in a coma from the time of the stabbing until his feeding tube was removed, resulting in his death. Aluat would not have died but for the stabbing, and the medical examiner ruled his death a homicide.

Defense Evidence

Abiel testified in his own defense. He claimed that while at the club, Aluat approached him and he extended his hand but that Aluat responded by punching him in the head. Abiel asked him to stop, but Aluat pushed him. Abiel then spoke to Monythot, who removed Aluat from the club. Abiel testified he left the club at about 3:00 a.m. and while he walked to his car, was approached by Wiir, Manon and Aluat. Abiel told Wiir that Aluat had punched him, and the men began pushing and punching each other. Aluat and Manon also punched Abiel, who fought back. Police eventually arrived.

While Abiel was heading home, he called Manon to ask why he was fighting with him but Manon ended the call. He then called Maluahi, who was with Manon. Abiel asked to speak with Manon, but Manon again ended the call. Abiel went to Maluahi's house, and when Manon eventually arrived there and saw him, Manon "rushed" him. Abiel grabbed Manon,

who started throwing punches. Police arrived and Manon walked away, but as soon as police left, he returned and tried to engage in another fight with Abiel. Police returned and gave Manon a ride home. After police left, Abiel could not find his car keys, and tried to call Manon to beg for his keys. Manon cussed at him and ended the call. Abiel decided to sleep in his car, which was blocking the sidewalk. While he was resting, he texted his employer and went through his phone.

Abiel testified that at around 7:00 a.m., his driver's side door opened. When Abiel opened his eyes, he saw Aluat moving toward him. According to Abiel, Aluat punched him and said, "I got you now, motherfucker." Aluat punched Abiel two or three times while Abiel tried to fight his way out of the car. Manon jumped in to punch Abiel with his left hand, and Abiel saw a knife in his right hand. Abiel grabbed Manon's right hand, hit it, and the knife fell to the ground. As soon as Abiel picked up the knife, Aluat closed in on him, punching him and grabbing him by the neck. The men were yelling and Abiel was screaming for help. When Aluat choked him, Abiel jabbed him in the back with the knife, then jumped back and slashed at Aluat when Aluat closed in on him again. Manon walked away, and Abiel called 911. He testified he did not tell the 911 operator about the knife because he panicked, the incident was still fresh, and everything happened fast.

On cross-examination, Abiel admitted that he walked to a dumpster in the alley and tossed the knife in it. He also admitted that he lied to police about using a knife and stabbing Aluat.

(Lodgment No. 7 at 2-7.)

## PROCEDURAL BACKGROUND

On June 10, 2013, the San Diego District Attorney filed a one-count amended information charging Petitioner with murder (Cal. Penal Code § 187(a)). (Lodgment No. 2 at 6-7.) In the amended information, it was also alleged that Abiel personally used a deadly or dangerous weapon during the commission of the murder (Cal. Penal Code §§ 1192.7(c)(23) & 12022(b)(1)). (*Id.*)

On June 25, 2013, a jury convicted Abiel of second degree murder, and found the deadly weapon allegation to be true. (*Id.* at 198; *see also* Lodgment No. 1, vol. 9 at 1016.)

On September 6, 2013, the trial court sentenced Petitioner to 16 years-to-life in prison.[2] (Lodgment No. 2 at 195; *see also* Lodgment No. 1, vol. 10 at 1026.)

Abiel appealed his conviction to the California Court of Appeal, arguing (1) the trial court improperly instructed the jury on the mutual combat exception to self-defense, under CALCRIM No. 3471; (2) the evidence was insufficient to support an instruction on mutual combat; (3) the instruction erroneously prevented the jury from considering self-defense and imperfect self-defense; and (4) the cumulative effect of the errors required reversal of his conviction. (*See* Lodgment No. 4.) On December 17, 2014, the appellate court denied Abiel's claims and affirmed the conviction. (*See* Lodgment No. 7.) On January 22, 2015, Abiel filed a petition for review in the California Supreme Court, raising the same four claims. (Lodgment No. 8.) The court denied the petition on March 13, 2015, without comment or citation. (Lodgment No. 9.)

Abiel filed a petition for writ of habeas corpus with the California Court of Appeal on April 18, 2016. (Lodgment No. 10.) In it, Petitioner raised the same four claims presented in his direct appeal and added three additional, but related, claims: his conviction was unconstitutional because there was overwhelming evidence presented at trial that he acted in self-defense; he was denied his right to present a defense when the trial court failed to adequately instruct the jury on self-defense; and trial counsel was ineffective by failing to develop exculpatory evidence regarding self-defense and imperfect self-defense. (*See id*.) On April 9, 2016, the appellate court denied the petition in a short, reasoned opinion. (Lodgment No. 11.)

Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court on May 17, 2016. (Lodgment No. 12.) The court denied the petition with an order which stated: "The petition for writ of habeas corpus is denied. See *People v. Duvall*, 9

---

[2] The trial court sentenced Abiel to 15 years-to-life on the second degree murder count plus one year for the deadly weapon enhancement. (*See* Lodgment No. 2 at 198; *see also* Lodgment No. 1, vol. 10 at 1026.)

Cal. 4th 464, 474 (1995); *In re Waltreus*, 62 Cal. 2d 218, 225 (1965); *In re Dixon*, 41 Cal. 2d 756, 759 (1953); *In re Swain*, 34 Cal. 2d 300, 304 (1949); *In re Lindley*, 29 Cal. 2d 709, 723 (1947)."  (Lodgment No. 14.)

On October 5, 2016, Abiel filed the instant federal petition for writ of habeas corpus.[3]  (ECF No. 1.)  Respondent filed an Answer and Memorandum of Points and Authorities on March 10, 2017.  (ECF No. 19.)  On April 12, 2017, Petitioner filed a Traverse.  (ECF No. 22.)   On August 18, 2017, the Court determined that neither a Report and Recommendation nor oral argument were necessary for disposition of this case.  (ECF No. 23.)

**SCOPE OF REVIEW**

Abiel's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the Court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

---

[3]  Abiel originally filed the petition in the District Court for the Central District of California.  That Court transferred the case to this District on October 28, 2016.  (ECF No. 11.)

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at

8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## DISCUSSION

In his Petition, Abiel raises claims related to jury instruction, sufficiency of evidence, and ineffective assistance of counsel. Because the claims are not consistently enumerated in the Petition and its attachments and some of the claims overlap and/or are repetitive,[4] the Court has grouped Petitioner's claims as follows: (1) whether the trial court improperly instructed the jury on "mutual combat" and self-defense, in violation of his right to present a defense and his due process rights; (2) whether there was insufficient evidence to support his conviction, in violation of his due process rights; and (3) whether Petitioner received ineffective assistance of trial counsel, in violation of his Sixth Amendment rights. (*See generally*, Pet. at 5-6, 9-13, 33-34.)

Respondent argues that, as to claims one and two, the state court's denial was neither contrary to, nor an unreasonable application of, clearly established law. (*See* Mem. of P.&A. Supp. Answer at 18-28, ECF No. 19-1.) As to claim three, Respondent argues that Petitioner has failed to state a claim with sufficient legal and factual specificity. (*See id.* at 28-29.)

### 1. <u>Right to Present a Defense and Jury Instructions</u>

Abiel argues that his right to present a defense and his right to due process were violated when the trial court erroneously instructed the jury on "mutual combat" and self-defense. Specifically, he contends there was insufficient evidence to support instructing

---

[4] For instance, Petitioner lists two specific grounds for relief in the form petition while simply directing the Court to "see attachment" for three additional grounds. (*See* Pet. at 5-6.) In various attachments he lists seven errors (many of which overlap or are repetitive) in one document, and in another section enumerates four claims. (*See* Pet. at 30-31, 33-34.)

9

the jury regarding "mutual combat" pursuant to CALCRIM No. 3471. Further, he claims that by erroneously instructing the jury on "mutual combat," the trial court prevented the jury from properly considering his self-defense theory. (*See* Pet. at 9, 33, 50-52, *see also* Traverse at 10, 18-19.)

Abiel raised this claim in his petition for review to the California Supreme Court and it was denied without comment or citation. (*See* Lodgment Nos. 8 & 9.) The Court therefore looks through to the last reasoned decision to address the claim, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court denied the claim, stating:

### A. *Standard of Review*

"We review de novo whether a jury instruction correctly states the law. [Citations.] Our task is to determine whether the trial court '"fully and fairly instructed on the applicable law." [Citation.]' [Citation.] When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citations.] We assume that the jurors are ""'intelligent persons and capable of understanding and correlating all jury instructions . . . given.""' [Citation.] If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it. [Citation.] Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*People v. Franco*, supra, 180 Cal.App.4th at p. 720; italics omitted; see also *People v. Bryant* (2014) 60 Cal.4th 335, 433.)

### B. *Contentions*

Abiel contends CALCRIM No. 3471 does not accurately reflect the law with regard to the mutual combat exception to the right of self-defense. He argues the instruction, which he maintains has two "critical flaws," includes language that permits a finding of mutual combat even when the prearrangement, mutual consent or agreement to fight did not precede the initiation of hostility. Abiel argues the first flaw in the instruction is its language indicating a fight is mutual combat when it is continued by express or implied mutual consent, and not merely when the mutual consent

10

precedes the initiation of hostilities. He argues the second flaw is that the instruction states the agreement must occur "before the claim to self-defense arose." According to Abiel, based on the evidence, the jurors could reasonably have concluded that the final confrontation between Abiel and Aluat, culminating in Aluat's stabbing, was a continuation of the fight or fights that occurred at the club and that the men's conduct evinced an implied agreement to continue the fight before Manon introduced his knife. Thus, Abiel argues, the jury would have found under the given self-defense and mutual combat instructions that the continuation of the fight preceded the moment when he reasonably feared death or great bodily injury, and he therefore "forfeited his right to self-defense by the very exercise of that right because he did not first refuse to fight, communicate his peaceful intentions to Aluat and give Aluat an opportunity to desist." Abiel argues this is an "absurd" result under *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*).

          C.    *Ross*

In *Ross*, supra, 155 Cal.App.4th 1033, the defendant and a woman "engaged in a hostile verbal exchange, at the culmination of which she slapped [the defendant, who] responded with a blow that fractured her cheekbone." (*Ross*, at p. 1036.) The defendant was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that a person charged with assault cannot successfully plead self-defense if he was engaged in mutual combat with the alleged victim. (*Id.* at p. 1042 & fn. 8.) The trial court refused the deliberating jurors' request for a legal definition of "mutual combat," telling them there was no legal definition and instead to rely on the common, everyday meaning of those words. (*Id.* at p. 1042.) The appellate court held this was error; that the phrase mutual combat was "too broad to convey the correct legal principle" and the jury was therefore "left . . . free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Id.* at pp. 1036, 1047, 1056.)

The *Ross* court explained: "Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other. The 'combat' element of this rule is clear enough, at least for present purposes. It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with

six-guns on the dusty streets of fabled Dodge City." (*Ross*, supra, 155 Cal.App.4th at p. 1043, fn. omitted.) The court cautioned that under the ordinary meaning of the words mutual combat, "any combat may be correctly described as 'mutual' so long as it is seen to possess a quality of reciprocity or exchange. . . . If A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as 'mutual combat' in the ordinary sense of those words. But as this example demonstrates, the phrase so understood may readily describe situations in which the law plainly grants one of the combatants a right of self-defense." (*Id*. at p. 1044.) Thus, the court observed, "the phrase 'mutual combat' is not only ambiguous but a misnomer. The mutuality triggering the doctrine inheres not in the combat but in the preexisting intent to engage in it. Old but intact caselaw confirms that as used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. . . . 'Both before and since [the 1872 enactment of Penal Code section 197] the phrase "mutual combat" has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of a duel or other fight begun or continued by mutual consent or agreement, express or implied. [Citations.]' (Italics added.) In other words, it is not merely the combat, but the preexisting intention to engage in it, that must be mutual." (*Id*. at p. 1045, fn. omitted.) In a footnote at this point, the *Ross* court stated: "Respondent glosses over this requirement by asserting that the doctrine requires only that both parties 'want to fight.' Missing is the critical requirement that this common intention or desire must precede the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target. If A triggers such a right in B by striking him, B does not forfeit that right merely because the blow makes him 'want to fight.' Hot blood may cause him to exercise the right unreasonably, and to that extent he will forfeit it. But his 'want[ing] to fight' does not make it a case of mutual combat." (*Id*. at p. 1045, fn. 14.) The court finally summarized: "We are satisfied that 'mutual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied agreement to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id*. at pp. 1046–1047.)

In *Ross*, the evidence was insufficient to establish any such arrangement or agreement. That is, the appellate court held the evidence showed "an exchange of belligerent comments culminating in an impulsive and unexpected blow by [the woman] to which defendant responded with a combination, flurry, or barrage of blows," and therefore no reasonable juror could conclude beyond a reasonable doubt that when the blows were exchanged, both parties had formed the intent to engage in a fight. (*Ross*, supra, 155 Cal.App.4th at p. 1052.) Furthermore, the appellate court concluded a properly instructed jury would have understood that the defendant was entitled to defend himself if he actually and reasonably anticipated "that a further blow -- even a slap -- was imminent." (*Id.* at p. 1055.) And the jury's question about the instruction suggested it misunderstood it in precisely the way the appellate court outlined, and thus misapplied it to improperly disqualify the defendant from asserting his right to defend himself. (*Id.* at p. 1056.) For these reasons, the court concluded the error was prejudicial. (*Id.* at pp. 1057-1058.)

D.     Analysis

We agree with the People that CALCRIM No. 3471 is a legally accurate and unambiguous instruction that did not mislead the jury or require it to conclude that Abiel was somehow precluded from asserting a claim of self defense. As the People point out, the instruction, as read to the jury, included a definition of mutual combat as a fight that "began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose."

Under that definition and the instruction as a whole, we conclude a reasonable jury would not read it as Abiel proposes: that a person's conduct in responding in self defense may become mutual combat simply because the person exercising his self-defense right "continues" the fight by fighting back. The instruction makes clear that there must be proof of an agreement to commence the fight or continue it if it was already in progress. Thus, the jury would not have been misled by the instruction in this manner; stated another way, there is no "reasonable likelihood that the jury misconstrued or misapplied [CALCRIM No. 3471's] words." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237; *see also People v. Mayfield* (1997) 14 Cal.4th 668, 777.) Abiel criticizes the instruction for informing the jury that the agreement must occur before the claim of self-defense arose, rather than, as Ross assertedly requires, before the "'initiation of hostilities.'" He maintains those are two different tests. But *Ross* does not support that

16cv2685-MMA (JMA)

assertion or restrict the inquiry to one test; as summarized above, *Ross* explains that a "critical requirement" of mutual combat is that the common intention precede "at least the first conduct sufficient to trigger a right of self-defense in its target" (*Ross*, supra, 155 Cal.App.4th at p. 1045, fn. 14) and the court concluded that "there must be evidence from which the jury could reasonably find that both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id*. at p. 1047.) Thus, using *Ross* as a guide as Abiel does, the language of CALCRIM No. 3471 is not legally erroneous.

Nor does CALCRIM No. 3471 lead to absurd results, as Abiel maintains. In *Ross*, the absurdity arose because the trial court told the jurors to apply an everyday meaning of the phrase "mutual combat," which without further definition allowed them to conclude that "any violent struggle between two or more people, however it came into being" was a situation of mutual combat. (*Ross*, supra, 155 Cal.App.4th at p. 1044.) However, the instruction used in the present case, which was applied to facts entirely different from those in *Ross*, complies with the law. Abiel's self-serving version of events was that Aluat and Manon ambushed him while he was sleeping in his car, and that during Abiel's scuffle with Aluat, Manon later produced a knife, which Abiel knocked from Manon's hand, grabbed and used on Aluat, who was choking him. As the People point out, if we adopt that version of events, CALCRIM No. 3471 made clear that Abiel, who initially responded to Aluat with nondeadly force, was permitted to use deadly force when Manon responded with such sudden and deadly force (i.e., producing the knife) that Abiel could not withdraw from the fight, and in those circumstances, Abiel "was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting." (CALCRIM No. 3471.) If the jury was to adopt Abiel's version of events, it would not conclude, given the entirety of the jury instructions, that Abiel forfeited his right to self-defense by acting in response to Manon's production of a knife without giving Aluat an opportunity to desist. Our conclusion does not change by the fact that only one of the two men who assertedly attacked Abiel produced a knife.

Furthermore, the court instructed the jury about Abiel's right to defend himself (CALCRIM No. 505); specifically, that Abiel would act in lawful self-defense if he "reasonably believed that he was in imminent danger of being killed or suffering bodily injury or was in imminent danger of being killed or suffering great bodily injury"; he "reasonably believed that the immediate use of deadly force was necessary to defend against that

danger"; and he "used no more force than was reasonably necessary to defend against that danger." [Footnote 5 omitted.] It further instructed that the jury could find Abiel guilty of voluntary manslaughter based on imperfect self-defense if he had an actual but unreasonable belief in the need to use deadly force to defend himself. And, it instructed the jury with CALCRIM No. 200 that "[s]ome of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. [¶] After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

Under all of the instructions, if the jury found mutual combat did not occur under the facts of the case, they were told to disregard the reference to mutual combat. But this did not eliminate from the jury's consideration evidence of self-defense or imperfect self-defense, on which the jury was instructed. We presume the jurors understood and were able to correlate all of the court's instructions, and that their own intelligence and expertise prevented them from relying on a factually inadequate theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131 ["jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory'"].) Accordingly, the circumstances demonstrate that the jury was in fact permitted to consider Abiel's claim of self defense under proper instructions.

(Lodgment No. 7 at 9-19.)

As an initial matter, to the extent Abiel contends the jury instructions regarding mutual combat and self-defense were erroneous under California state law, his claim in not cognizable. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (finding issues regarding state law are not cognizable on federal habeas corpus review). An instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988); *see also Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986) (claims that merely challenge correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights).

To merit relief when an allegedly erroneous jury instruction is given, or an instruction is omitted, a petitioner must show that the ailing instruction by itself so

infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 71-72; *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). For instructional error to amount to a due process violation Petitioner must show both that the instruction was defective and that there was a "reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (quoting *Estelle*, 502 U.S. at 72 (internal quotation marks and citation omitted)); s*ee also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

In addition, due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006). "[T]he right to present a defense 'would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.'" *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) (quoting *Tyson v. Trigg*, 50 F.3d 436, 448 (7th Cir. 1995)). It is therefore well established that a criminal defendant is entitled to adequate instructions on the defense's theory of the case. *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000). Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'" *Clark*, 450 F.3d at 904-05 (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)). However, a defendant is not entitled to have jury instructions phrased in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

As noted above, Abiel argues that the jury was improperly instructed on self-defense and mutual combat, thereby preventing him from presenting his theory of the case. The jury was given three instructions related to self-defense which are relevant here. First, it was instructed on justifiable homicide and self-defense under CALCRIM No. 505. In short, when a defendant has a reasonable belief that he is in imminent danger

of being killed or severely injured, that person may use reasonable force to defend him or herself.[5]  Next, the trial court instructed the jury on "imperfect self-defense" and the lesser-included offense of voluntary manslaughter, under CALCRIM No. 571, as follows:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.  If you conclude the defendant acted in complete self-defense his action was lawful and you must find him not guilty of any crime.  The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.  The defendant acted in imperfect self-defense if:
>
> 1.      The defendant actually believed that he was in imminent danger

---

[5]  The trial court's instruction on self-defense under CALCRIM No. 505, in relevant part, as follows:

> The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense.  The defendant acted in lawful self-defense if:
>
> 1.      The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being killed or suffering great bodily injury;
>
> 2.      The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;  AND
>
> 3.      The defendant used no more force than was reasonably necessary to defend against that danger.
>                                         ....
>
> When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed. . . .
>
> . . . If you find that Marko Aluat threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.
>
> Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

(Lodgment No. 3 at 12-13.)

of being killed or suffering great bodily injury; and

      2.     The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but

      3.     At least one of those beliefs was unreasonable.

      Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. If you find that Marko Aluat threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs. If you find that the defendant received a threat from someone else that he reasonably associated with Marko Aluat, you may consider that threat in evaluating the defendant's beliefs. . .

      . . .The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder.

(Lodgment No. 1, vol. 9 at 952; *see also* Lodgment No. 3 at 15-16.) And finally, the trial court instructed the jury on "mutual combat" pursuant to CALCRIM No. 3741, as follows:

      A person who engages in mutual combat has a right to self-defense only if:

      1.     He actually and in good faith tried to stop fighting;

      2.     He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; AND

      3.     He gave his opponent a chance to stop fighting.

      If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

      However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend

16cv2685-MMA (JMA)

himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

(Lodgment No. 3 at 18-19; *see also* Lodgment No. 1, vol. 9 at 965-57.)

Petitioner argues that the trial court erred in giving CALCRIM No. 3741 because (1) the instruction misstated California law, and (2) there was insufficient evidence of "mutual combat" to support giving the instruction. He also appears to argue that by giving CALCRIM No. 3471, the trial court effectively negated the other self-defense instructions provided under CALCRIM Nos. 505 and 571. (*See* Pet. at 33, *see also* Traverse at 18-19.)

Upon review of the relevant record, the Court concludes that the giving of CALCRIM No. 3471 in the context of this case did not violate petitioner's right to due process. First, as the California Court of Appeal concluded, CALCRIM No. 3471 accurately described California law regarding self-defense and mutual combat. California Penal Code section 197(3) qualifies the right to self-defense by stating that if a defendant is "the assailant or engaged in mutual combat, [he] must really and in good faith have endeavored to decline any further struggle before the homicide was committed." Cal. Penal Code § 197(3). Further, CALCRIM No. 3471 properly states that mutual combat must have begun "or continued by mutual consent or agreement" and that the agreement, whether express or implied, must occur prior to the self-defense claim. *See People v. Ross*, 155 Cal. App. 4th 1033, 1046-47 (Cal. Ct. App. 2007) (stating that both combatants must have "actually consented or intended to fight before the claimed occasion for self-defense arose"); *see also People v. Johnson*, 180 Cal. App. 4th 702, 704-05 (Cal. Ct. App. 2009). The Court must defer to the state's interpretation of its own laws. *See Estelle*, 502 U.S. at 67-68; *see also Bueno v. Hallahan*, 988 F.2d 86,

19

88 (9th Cir. 1993) (federal habeas courts must defer to state courts' interpretations of their own state laws).

Petitioner further argues that, even assuming the instruction was an accurate reflection of state law, the trial court erred in giving it because there were insufficient facts to support the prosecution's "mutual combat" theory. The Court notes that Petitioner points to no clearly established Supreme Court authority which "prohibits a trial court from instructing a jury with factually inapplicable but accurate statement of state law." *Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1011 (N.D. Cal. 2016); *see also Steele v. Holland*, 2017 WL 2021364, at *8 (N.D. Cal. May 12, 2017) ("Petitioner does not cite, and the Court is not aware of any clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law."); *Martinez v. Hollond*, 2015 WL 10044281, at *18 (C.D. Cal. Mar. 30, 2015) (Giving "an instruction which is not supported by the evidence is not a due process violation." (citation omitted)), report and recommendation adopted by, 2016 WL 552679 (C.D. Cal. 2016). As such, the state court's rejection of this claim cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court. . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (citation omitted)).

Furthermore, even assuming that due process requires factual support for a jury instruction, in this case the prosecution presented ample evidence to support its theory that Abiel engaged in "mutual combat" with Aluat. (*See* generally, Lodgment No. 1, vol. 9 at 980-82, 986-87.) Earlier in the evening, Abiel was in a fight with Wiir, Aluat's best friend. (Lodgment No. 1, vol. 4 at 376-78, 380-81; vol. 7 at 771-72, 809-10, 812-13.) After leaving the club (and a few hours before the stabbing), Abiel got in a fight with Manon. Several witnesses testified that when Manon arrived at Maluahi's apartment, he got out of the car and Abiel immediately grabbed him and started yelling and swearing. A fight ensued between Abiel and Manon. Maluani, Monythot and Kafi had to break it

20

up. (*Id.*, vol. 4 at 345-46, 352-53, 388, vol. 5 at 434-35.) Police arrived and the crowd dispersed. An officer drove Manon home. (*Id.*, vol. 5 at 491.) The officer testified that Manon was very emotional and, at times, crying. (*Id.* at 490-91, 496-97.)

Later that morning, Manon returned to Maluahi's apartment, this time accompanied by Aluat. An eyewitness, Nineke Koopman, testified that she heard shouting outside her apartment. She looked out her window and saw three men, two of whom got into a physical altercation in the street. She later identified these two men as Abiel and Aluat. (*Id.*, vol. 6 at 530, 533-34, 540.) She stated that Abiel was advancing toward Aluat while Aluat was "backing away trying to get away" from him. (*Id.* at 535.) Kooman noted that Aluat did not have his fists up in a combative stance. (*Id.* at 535-36.) Koopman testified that she saw Abiel hit Aluat, causing Aluat to fall to the ground. (*Id.* at 534, 565.) She never saw Aluat with a knife. (*Id.* at 536.) Koopman stated that the third man was not involved in the physical fight and was standing 25 to 30 feet away. (*Id.* at 536, 540.)

Based on this and other evidence presented at trial, it was the prosecution's theory that when Manon and Aluat arrived, Abiel saw or heard them and got out of his car to confront them. A fight ensued between Abiel and Aluat during which Abiel stabbed Aluat two times. When viewed in the light most favorable to the prosecution's theory, there is sufficient evidence to warrant giving the mutual combat instruction. *See People v. Cole*, 33 Cal. 4th 1158, 1206 (Cal. 2004) ("A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof.")

Petitioner argues the jury should not have been instructed pursuant to CALCRIM No. 3471 because there was no evidence of a preexisting "mutual agreement or consent" to fight prior to the altercation. *See* CALCRIM No. 3471 (stating that a "fight is mutual combat when it began or continued by mutual consent or agreement"). He points to his own testimony that he was reclined on the front seat of his car with his eyes closed when

Aluat and Manon suddenly opened the door and began beating him. (Lodgment No. 1, vol. 7 at 786-87, vol. 8 at 832-35.) He testified that Manon had a knife, which Abiel managed to take from him. Petitioner only used the knife to defend himself from Aluat who continued to come at him. (*Id.*, vol. 7 at 792-94; vol. 8 at 838, 841-42, 865.) In short, Abiel argues that, contrary to the prosecution's theory, he was ambushed by Manon and Aluat. As such, he claims the mutual combat instruction rendered his trial fundamentally unfair.

That Petitioner presented a different plausible theory at trial does not render the instruction regarding "mutual combat" erroneous. It was for the jury to evaluate the evidence and make the factual determination. Even assuming arguendo that the "mutual combat" instruction was not warranted by the facts, the trial court's decision to give the challenged instruction did render Abiel's trial fundamentally unfair. The instruction did not prevent the jury from finding that Abiel acted in self-defense or imperfect self-defense. Rather, the instruction stated only that he could not legitimately claim self-defense under specified circumstances. Indeed, contrary to Petitioner's claim, CALCRIM No. 3471 did nothing to negate the jury instructions on perfect and imperfect self-defense. The jury was free to disregard the mutual combat instruction if it credited Petitioner's version of the facts. The trial court specifically instructed the jury to follow only the instructions that applied to the facts of the case as they found them, stating:

> Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

(Lodgment No. 3 at 2; Lodgment No. 9 at 934; *see also* CALCRIM No. 200.) The jury is presumed to have followed these instructions. *Weeks v. Angelone*, 528 U.S. 225, 226 (2000).

Under the facts presented here, the mutual combat instruction did not "so infuse[ ] the trial with unfairness as to deny due process of law." *Lisenba v. California*, 314 U.S.

219, 228 (1941). As such, the California Court of Appeal's denial of the Petitioner's jury instruction claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1), *Williams*, 529 U.S. at 407-08. Moreover, based on review of the entire record, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *See* 28 U.S.C. § 2254(d)(2) *see also Taylor*, 366 F.3d at 1001. Accordingly, the Court **DENIES** habeas relief as to Petitioner's jury instruction claim.

## 2. Sufficiency of Evidence

Next, Abiel claims there is insufficient evidence to support his conviction, in violation of his due process rights.[6] (Pet. at 5, 9-10, 52-54 *see also* Traverse at 2-3, 18-19.) Specifically, he argues there is insufficient evidence to show a mutual agreement to fight before the physical altercation began. He contends there was insufficient evidence prove he had the requisite mental state required to support his second degree murder conviction. (*See id.*)

Abiel raised this issue in his petition for review to the California Supreme Court, which was denied without comment or citation. (*See* Lodgment Nos. 8 & 9.) As such, the Court looks through to the opinion of the California Court of Appeal, the last reasoned state court decision to address this issue. *See Ylst*, 501 U.S. at 805-06. The appellate court denied the claim, stating:

> Abiel contends that notwithstanding his arguments as to the legal correctness of CALCRIM No. 3471, we should reverse his conviction because there was insufficient evidence an agreement to fight existed before the initiation of hostilities to warrant giving the instruction. Abiel relies on the principles that the court errs by giving an instruction that, though correct, has no application to the facts of the case (*People v. Guiton*, supra, 4 Cal.4th at p. 1129) and that a judgment should be reversed when a review of the

---

[6] Petitioner also references the Eighth Amendment in his Petition. (See Pet. at 5.) The substance of his claim, however, is the insufficiency of the evidence to convict him of second degree murder, rather than disproportionality of his sentence. *See Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (stating that the Eighth Amendment forbids "only extreme sentences that are 'grossly disproportionate' to the crime").

record demonstrates a reasonable probability that the jury found a defendant guilty solely on the unsupported theory. (*Id*. at pp. 1129-1130.) According to Abiel, "[t]here can be no question but that the jury convicted [him] 'solely on the unsupported theory' that [he] did not act in lawful self defense"; he argues the evidence shows Manon and Aluat came to the scene of Aluat's stabbing knowing about Abiel's presence and only after Manon already had fought with Abiel and others at that location.

In making this argument, Abiel disregards evidence from which the jury could have reasonably inferred that Abiel and Aluat, who were involved in the original dispute over Aluat pushing Abiel at the club, had mutually agreed to continue the earlier altercation and fight out their differences outside Maluahi's apartment. Though Abiel and Wiir had scuffled outside of the club, Wiir and Aluat were best friends, and according to Manon, Aluat offered to insert himself back into the situation when Manon expressed his interest in returning to Maluahi's house. By that time, Manon was aware that Abiel did not have his car keys, and could not leave the area. Koopman, who was a neutral witness, saw a group of men yelling at each other early that morning, and several hours later heard the second altercation among the men in which Abiel advanced on Aluat, who was backing up before he fell to the ground. Koopman's testimony, which Abiel disregards in his analysis, supports a theory that Abiel was at least equally engaged, if not the aggressor, in the fight with Aluat and not merely defending himself. Though the inference to be drawn is a slim one, it is not unreasonable to infer the men fought the second time at Maluahi's apartment by prearranged mutual intention or consent. Under the circumstances, there was sufficient evidence to support the giving of CALCRIM No. 3471 as to mutual combat.

(Lodgment No. 7 at 18-19.)

The Supreme Court has held that the due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005); *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam). The Court must review the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H*., 408 F.3d at 1276 (citing *Jackson*, 443 U.S. at 319). A petitioner's insufficient evidence claim must be examined "with

reference to the elements of the criminal offense as set forth by state law." *Juan H.*, 408 F.3d at 1275.

Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) amended on denial of reh'g, 798 F.2d 1250 (9th Cir. 1986)). A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds. *Juan H.*, 408 F.3d at 1274.

Here, as the California appellate court found, there was ample evidence to support a second degree murder conviction. Under California law, second degree murder is the "unlawful killing of a human being with malice aforethought, but without the additional elements -- i.e., willfulness, premeditation, and deliberation -- that would support a conviction of first degree murder." *People v. Neito Benitez*, 4 Cal. 4th 91, 102 (Cal. 1992) (citing Cal. Penal Code §§ 187(a), 189). Malice may be either express or implied. Cal. Penal Code § 188. Express malice requires an intent to kill; implied malice does not. *See People v. Gonzalez*, 54 Cal. 4th 643, 653 (Cal. 2012). Malice is implied when a person "willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." *Id.* (citing *People v. Knoller*, 41 Cal. 4th 139, 152 (Cal. 2007)). Finally, under California law, self-defense is not available for actions taken during mutual combat unless a there was a clear attempt by the defendant to stop the fighting. *See* CALCRIM No. 3471; *see also* Cal. Penal Code § 197(3).

As discussed above, the prosecution presented evidence to show that Abiel had been involved in a series of physical altercations with several individuals that evening. First, Abiel was in a fight with Wiir in the parking lot of Club Kabanas. (Lodgment No. 1, vol. 4 at 376-78, 380-81; vol. 7 at 771-72, 809-10, 812-13.) Kedid Manon testified

that Petitioner was screaming and acting crazy.[7] (Lodgment No. 1, vol. 4 at 381-81.) Police were called to break it up. (*See* Lodgment No. 3 at 22-24.)

After the fight broke up, Manon left with Maluahi and another friend, and the three drove to Maluahi's apartment. During the drive, Abiel called Manon and threatened to beat him up. (*Id.*, vol. 4 at 384-85.) Manon testified that upon arriving at Maluahi's house, Manon got out of the car and Abiel came running up to him and initiated another fight. (*Id.* at 387-89.) Other witnesses saw Abiel and Manon yelling and shoving each other. At one point, Malauhi grabbed Abiel and tried to hold him back but Abiel broke free and started fighting with Manon again. (*Id.*, vol. 8 at 875-76.) A neighbor, Nineke Koopman, saw the fight from her window and called police. (*Id.*, vol. 6 at 529.)

The crowd dispersed when the police arrived. An officer drove Manon, who was emotional and crying, home. (*Id.*, vol. 5 at 490-91, 496-97.) After he got home, Manon called several people in an effort to figure out why Petitioner was so upset with him. (*Id.*, vol. 4 at 391, 395, vol. 5 at 454 464.) Manon eventually called Abiel, who accused him of taking his car keys.[8] (*Id.*, vol. 4 at 392-93.) Back at Maluahi's, Petitioner searched in vain for his car keys. His car was parked illegally and in order to avoid getting a ticket, Petitioner decided to sleep in his car. (*Id.* at 349-51, 365-66, 368.)

Later that morning, Tonisha Alexander, Aluat's girlfriend, drove Manon and Aluat to Maluahi's house. (*Id.* at 390, 396-97, vol. 5 at 440-41.) Manon told Aluat he wanted to give Maluahi a parking ticket he had received, return Abiel's keys and try to figure out what happened the previous night. (*Id.*, vol. 4 at 383-84, 390, 394-95, 409-10, vol. 5 at 441-42, 451.) Manon testified that he got out of Alexander's car and walked ahead to Maluahi's apartment. Aluat lagged behind, talking with Alexander in the car. As

---

[7] On the 911 call recording, Abiel can be heard shouting in the background, while others urge him to leave. (*See* Lodgment No. 3 at 22-23.)

[8] Manon denied having Petitioner's car keys during the call and only realized later that he did, in fact, have Abiel's keys. (Lodgment No. 1, vol. 4 at 372, 393.)

Manon reached Maluahi's door, he heard Abiel and Aluat fighting.[9] (*Id.*, vol. 4 at 400-02, 406, vol. 5 at 456-57, 459, 464, 467, vol. 6 at 530-33, 541, 564.) Manon turned back and ran toward the street. When he arrived, Aluat was lying on the ground and Abiel was standing next to him with a knife in his hands. (*Id.*, vol. 4 at 402-04, 407, vol. 5 at 457-59, 467.)

Meanwhile, Koopman, the same witness who had called the police hours earlier, heard the fight and looked out her window. As noted above, Koopman saw Abiel coming toward Aluat, as if Abiel was the aggressor. Aluat had his hands up and appeared to be backing away. Then she saw Abiel strike Aluat, who fell to the ground and did not get up. (*Id.*, vol. 6 at 530, 533-35, 540.) She never saw Aluat with a knife. (*Id.* at 536.)

Petitioner testified that he stabbed Alaut in the back first, and then in the chest. (*Id.*, vol. 7 at 792-94, vol. 8 at 842, 845-51.) Abiel then threw the knife in a nearby dumpster. (*Id.*, vol. 7 at 795, 797-98, vol. 8 at 852-53.) He called 911 but failed to tell the dispatcher that Aluat had been stabbed. (*See* Lodgment No. 3 at 25-27.) He stated only that he had hit Aluat and he had fallen down. (*Id.*) When first interviewed by police, Petitioner denied stabbing Aluat and claimed he had no idea how Aluat had received the chest wound. He also denied knowing where the knife was. (*See* Lodgment No. 1, vol. 7 at 799, vol. 8 at 853-57, 865, 858; *see also* Lodgment No. 2 at 106-07, 109-11.)

When viewed in the light most favorable to the prosecution, the evidence presented at trial, along with reasonable inferences drawn therefrom, was sufficient to support the verdict. The jury could have inferred from Petitioner's conduct earlier in the evening and the accounts of witnesses that Abiel was a willing participant in the fight with Aluat. Koopman stated that Abiel appeared to be the aggressor. Although it may have been

---

[9] Manon admitted he had extremely poor eyesight. He stated that he could only see shapes. While testifying he was unable to describe what the prosecutor, who was standing 14 feet away from him, was wearing or discern whether the prosecutor had facial hair. (Lodgment No. 1, vol. 4 at 411-12.)

possible to draw a different inference from the evidence, the Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As noted above, Abiel maintains that he was ambushed while laying down in his car. But a reasonable juror could have discredited Petitioner's testimony, particularly in light of his hiding the knife and his failure to be truthful with the 911 dispatcher and police. Moreover, a reasonable juror, viewing the evidence in the light most favorable to the prosecution, could infer that Abiel saw or heard Manon and Alaut get dropped off by Aluat's girlfriend. Given the two previous fights Abiel participated in that evening, a reasonable juror could conclude that the ensuing fight between Abiel and Aluat was a result of mutual combat. Thus, viewing the evidence in the light most favorable to the prosecution, the Court finds a reasonable juror could conclude this was sufficient to find Abiel stabbed Aluat during mutual combat, and that he stabbed Aluat with implied malice and not in self-defense. *See Jackson*, 443 U.S. at 324.

Based on the foregoing, the Court concludes the state appellate court's denial of Abiel's claim that there was insufficient evidence to support his second degree murder conviction was neither contrary to, nor an unreasonable application of, clearly established law. 28 U.S.C. § 2254(d)(1), *Williams*, 529 U.S. at 407-08. Moreover, based on review of the entire record, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *See* 28 U.S.C. § 2254(d)(2) *see also Taylor*, 366 F.3d at 1001. Accordingly, the Court **DENIES** habeas relief as to Petitioner's sufficiency of the evidence claim.

### 3. Ineffective Assistance of Counsel

Lastly, Petitioner argues he received ineffective assistance of counsel, in violation of his Sixth Amendment rights, when trial counsel failed to develop "exculpatory" evidence regarding self-defense. (Pet. at 5, 9-10, 52-54 *see also* Traverse at 2-3, 18-19.) Respondent contends that Petitioner has failed to raise an ineffective assistance of counsel claim with adequate specificity. (Mem. of P.&A. Supp. Answer at 28-29.)

The Court must construe Abiel's *pro se* petition liberally. *Erickson v. Pardus*, 551

U.S. 89, 94 (2007) (per curiam) ("A document filed pro se is 'to be liberally construed,' and a 'pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Corjasso v. Ayers*, 278 F.3d 874, 878 (9th Cir. 2002) ("Pro se habeas petitioners may not be held to the same technical standards as litigants represented by counsel."); *United States v. Seesing*, 234 F.3d 456, 462 (9th Cir. 2001) ("Pro se complaints and motions from prisoners are to be liberally construed.").

Here, Petitioner makes several references to "ineffective assistance of counsel" in his Petition. While some of the references are general statements of law, the Petition does include some specific factual allegations. A careful review of the attachments to the Petition (referenced in the Petition) and Petitioner's Traverse make clear that Petitioner attempted to raise such a claim regarding defense counsel's purported failure to develop exculpatory evidence to show he acted in self-defense.

Petitioner raised this claim a petition for writ of habeas corpus filed with the California Supreme Court. The court denied the petition with citation to *People v. Duvall*, 9 Cal. 4th 464, 474 (1995); *In re Waltreus*, 62 Cal. 2d 218, 225 (1965); *In re Dixon*, 41 Cal. 2d 756, 759 (1953); *In re Swain*, 34 Cal. 2d 300, 304 (1949); *In re Lindley*, 29 Cal. 2d 709, 723 (1947). (*See* Lodgment No. 14.) The Court therefore looks through to the opinion of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. In denying Abiel's habeas petition raising the ineffective assistance of counsel claim, the appellate court noted that the petition was filed two-and-a-half years after sentencing and without any explanation for the delay. As such, the court found the petition was barred as untimely.[10] (Lodgment No. 11 at 2 (citing *In re Reno*, 55 Cal. 4th 428, 459

---

[10] The Court need not decide whether Petitioner is procedurally barred from raising his ineffective assistance of counsel claim because even if his claim is not defaulted, Petitioner is not entitled to habeas relief. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts may resolve easier matters where complicated procedural default issues exist); *see also See Trest v. Cain*, 522 U.S. 87, 89 (1997) (federal habeas court is not required to sua sponte raise

(2012); *Swain*, 34 Cal. 2d at 302).)  The court went on to also address the merits of Petitioner's claim, stating:

> Abiel has not established that his trial counsel's performance was deficient or that, but for such deficiency, he would have obtained a better outcome at trial, as he must do to obtain habeas corpus relief based on ineffective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693-94; *People v. Ledesma* (1987) 43 Cal. 3d 171, 215-218.) Abiel testified at trial regarding self-defense; his attorney argued self-defense and imperfect self-defense to the jury; and the trail court instructed the jury on both matters.  Abiel has neither identified any evidence regarding self-defense counsel failed to present at trial nor shown he would have obtained a more favorable outcome at trial had counsel presented such evidence.  (See *In re Clark* (1993) 5 Cal. 750, 766.)

(Lodgment No. 11 at 2.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  He must also show he was prejudiced by counsel's errors.  *Id*. at 694.  Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).  Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential."  *Strickland*, 466 U.S. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Id*. at 686-87.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either

procedural bar issue); *Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003) (procedural default is an affirmative defense).

16cv2685-MMA (JMA)

one.  *Id.* at 697.

 "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted).  These standards are "difficult to meet" and "demand[] that state court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  *Richter*, 562 U.S. 102-03 (quoting *Jackson*, 443 U.S. at 332 n.5.)  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."  *Strickland,* 466 U.S. at 687.

As discussed above, Abiel claims that defense counsel was ineffective for failing to "develop exculpatory evidence."  (*See* Pet. at 11-12, 33.)  He appears to argue specifically that defense counsel failed "to present a legal defense using [an] expert [to] develop [an] opinion" about how a person would react when "suddenly attacked."  (*Id.* at 8.)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  Counsel's performance, however, "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.  "A lawyer who fails to adequately investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."  *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

Petitioner contends defense counsel should have hired and presented testimony from an expert witness to support a claim of imperfect self-defense.  He suggests that an expert could have shown that, given Abiel's personal background and the circumstances

of the incident, Abiel would have believed he was in imminent danger, regardless of whether it was reasonable or not. "[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense." *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). An attorney's decision to call an expert is a matter of trial strategy. *See id.* at 834-35. Abiel has offered nothing but his own speculation that an expert would have testified, what an expert witness would have said, and whether it actually would have supported his defense. As such he has failed to show his attorney's performance was deficient. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer evidence that expert would have testified). Furthermore, any speculation by Petitioner as to what an expert would have said is insufficient to show prejudice. *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (concluding speculation about how an expert might have testified is not enough to establish prejudice). Just like other decisions that occur when preparing for and presenting a defense, the decision to call an expert witness is left to the discretion of trial counsel. *See id.*

With regard to Petitioner's general allegations that defense counsel "failed to develop exculpatory evidence," Petitioner fails to explain in his Petition or Traverse, how counsel's performance fell below an "objectively reasonable" standard under prevailing professional norms. Likewise, Abiel fails to allege facts to establish that had counsel done all the things about which Petitioner now complains, the result of his trial would have been different. Instead, Abiel merely asserts in conclusory terms that he is entitled to relief based on counsel's purported failure to present an adequate defense. Conclusory allegations of ineffective assistance of trial counsel, however, do not entitle petitioner to relief. *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995).

Thus, the state court's denial of Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13. Furthermore, the state court's decision was not based on an unreasonable determination of the facts in light of the

evidence presented at the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2) *see also Taylor*, 366 F.3d at 1001.  Accordingly, the Court **DENIES** habeas relief as to Petitioner's ineffective assistance of counsel claim.

### CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).  Granting such a certificate is appropriate "only if the applicant has made a substantial showing of the denial of a constitutional right[.]"  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In this case, Petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, the Court **DECLINES** to issue a certificate of appealability.

### CONCLUSION

Based on the foregoing, the Court **DENIES** the petition with prejudice.  Furthermore, the Court **DECLINES** to issue a certificate of appealability.

The Clerk of Court is instructed to terminate the case and enter judgment in favor of Respondent.

**IT IS SO ORDERED.**

DATED: November 3, 2017

HON. MICHAEL M. ANELLO
United States District Judge

16cv2685-MMA (JMA)